**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

ASHLEY JOSIE,

Plaintiff,

v.

CITY OF PRINCETON and PRINCETON PUBLIC UTILITIES COMMISSION,

Defendants.

Case No. 24-cv-3449 (LMP/LIB)

**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

---

Samuel Kramer and Katherine Rollins, **MacDonald Hoague & Bayless, Minneapolis, MN**; and Anika Ades, **MacDonald Hoague & Bayless, Seattle, WA**, for Plaintiff.

Dyan J. Ebert and Cally Kjellberg-Nelson, **Resolute Law LLC, St. Cloud, MN**, for Defendants.

Ashley Josie brought this action on August 28, 2024, alleging that the City of Princeton (the "City") and her employer, the Princeton Public Utilities Commission ("PPUC") (collectively "Defendants"), violated various federal and state statutes when they terminated her employment. Josie now moves for partial summary judgment as it relates to her claims under the Family and Medical Leave Act ("FMLA"). Defendants move for summary judgment on all of Josie's claims. For the following reasons, the Court denies Josie's motion for summary judgment in its entirety and grants in part and denies in part Defendants' motion for summary judgment.

## BACKGROUND

### I. Factual Background

Josie worked as a billing clerk for the PPUC from early 2023 to the time she resigned in early 2024. She alleges, in broad strokes, that her resignation was involuntary, and that the PPUC's actions leading up to her resignation gave her little choice but to resign. Specifically, she alleges that before her resignation, the PPUC forced her into accepting a demotion to part-time status. She contends that the PPUC forced this demotion because it learned that she and her son suffer from disabilities, because she requested leave under the FMLA and Minnesota law, and because she complained to the PPUC that its refusal to grant her protected leave was in violation of Minnesota law. If the PPUC's actions were motivated by either Josie's or her son's disabilities, Josie's request for FMLA leave, or Josie's complaint, Josie contends the actions were unlawful.

Both sides have moved for summary judgment, placing several issues before the Court. Because the parties disagree about whether the PPUC is a qualifying employer covered by the FMLA, and because the resolution of that question requires examining the relationship between the PPUC and the City, the Court first delves into the relationship between these two entities.

#### A. Relationship between the PPUC and the City

The PPUC is a "public utilities commission" ("PUC") that provides electricity and water to residents of Princeton, Minnesota. ECF No. 57-1 at 19:1–19. The PPUC, like all Minnesota PUCs, was created and is governed by Minnesota law. *See generally* Minn. Stat. §§ 412.331–412.391. Relevant here, Minnesota law provides that "[a]ny statutory

city may by ordinance . . . establish a public utilities commission with the powers and duties set out in" sections 412.331–412.391. *Id.* § 412.331. A PUC may consist of three, five, or seven members, and each member is appointed by the city council. *Id.* § 412.341, subd. 1(a). City council members may serve on the commission, subject to certain numerical limits, and commissioners receive a salary set by the council. *Id.* subd. 2. A city council may also increase or decrease the number of commissioners, *id.* subd. 3, and may abolish a PUC after putting the issue to a public vote, *id.* § 412.391, subds. 2, 4.

After a PUC is established, Minnesota law provides the PUC substantial autonomy. For instance, a PUC may extend, modify, or rebuild any public utility and "do anything it deems necessary for its proper and efficient operation," including entering into "necessary contracts for these purposes." *Id.* § 412.361, subd. 1. Further, the PUC has the authority to "prescribe duties of officers and employees and fix their compensation," "to buy all fuel and supplies . . . for municipal distribution," and "to fix rates and to adopt reasonable rules and regulations for utility service." *Id.* subds. 2–4. A PUC may also treat its city as a customer by entering "into agreements with the council for payments by the city for utility service," make "payments to the city in lieu of taxes," and come to "agreements on other subjects of relationships between the commission and the council." *Id.* subd. 5.

Here, the City established the PPUC through ordinances that largely track the language of Minnesota Statutes. *See generally* Princeton, Minn., Gen. Code of Ordinances

tit. 2, ch. 290, §§ 290.01–290.09 (2024).[1] Chapter 290 states that Princeton "owns and operates various municipal utilities" such as the PPUC and that the PPUC was established "with the powers and duties" set forth in Minnesota Statutes sections 412.331 to 413.391. *Id.* § 290.01. The PPUC is a three-member commission, *id.* § 290.03(A), and it was given the authority to manage the City's water, light, and power systems, *id.* § 290.04. The City maintains the ability to remove any "member or officer" of the PPUC for "proper cause" by majority vote of the city council. *Id.* § 290.09.

The PPUC has 13 employees, ECF No. 57-1 at 19:20–20:3, and is led by General Manager Keith Butcher and office manager Christina Cunningham, *id.* at 18:9–16; ECF No. 57-2 at 13:5–9. The PPUC's day-to-day operations are, by and large, separate from the City. ECF No. 57-1 at 21:6–12. For instance, the PPUC is funded exclusively through payments made by utility customers and occasional government grants. *Id.* at 20:4–24. The PPUC sets its own rates, *id.* at 20:20–24; hires and pays its own employees, ECF No. 57-5 at 76:11–15; has its own building and offices, ECF No. 57-1 at 24:15–25:8; and has its own phone systems, email systems, servers, health insurance plans, and personnel files, *id.* at 108–110.

But the PPUC and the City are not wholly independent. For instance, while the PPUC is responsible for electrical and water services in Princeton, the City itself maintains responsibility for managing wastewater services. *Id.* at 39:17–22. And the City has

---

[1] A permanent link to the City's Code of Ordinances can be found at https://perma.cc/4LZF-293M.

contracted with the PPUC to calculate and collect wastewater payments, which the PPUC then forwards to the City in exchange for an administrative fee. *Id.* at 40:9–17, 47:7–49:2. Josie, in her role as a billing clerk for the PPUC, occasionally took direction from and communicated with the City Administrator, Michelle McPherson. ECF No. 53-34 at 10:23–24; ECF No. 53-33 at 9:2–8, 15:23–17:15.

The PPUC and the City exchange money and services in formal and informal ways. For example, the PPUC makes a "PILOT" payment, which is a voluntary "payment in lieu of taxes" that the PPUC pays to the City "as a recognition from the loss of taxes that the City gets from [the PPUC] being a nontaxable entity and using . . . the property" in Princeton. ECF No. 57-1 at 73:8–17. Similarly, the City at times collects or raises funds to help pay for PPUC construction projects. ECF No. 53-32 at 78:20–80:16. The PPUC also voluntarily chooses not to charge the City for the electricity it provides to power the City's streetlights. ECF No. 53-34 at 35:12–19; *see also* 53-2 at 74 (estimating the "net benefit" of the streetlight forgiveness). Further, the City and the PPUC occasionally share equipment and services to assist one another in minor construction or improvement projects. ECF No. 53-32 at 93:11–94:9.

Finally, while the PPUC and the City are largely distinct, the City lists the PPUC on its website and includes Butcher in its staff directory. ECF No. 53-22 at 5. Butcher also attends weekly "department-head meetings" with the City and all its "internal department heads," including "[t]he liquor store manager, the community development director, the public works director, the police chief, the fire chief, [and] the wastewater treatment manager." ECF No. 53-33 at 10:8–13, 11:5–8. Butcher is the only "internal department

head" who is not, technically, a City employee. *Id.* at 11:9–17. And when the PPUC hired an auditor in 2024, the auditor repeatedly identified the PPUC as a "component unit of the City of Princeton." ECF No. 53-27 at 10.

### B. Josie's Employment

Josie began working for the PPUC as a billing clerk on January 17, 2023, and managed the PPUC's billing and collection processes. ECF No. 64-17 at 33:15–20, 39:12–14; ECF No. 53-9. The position was full-time, which entitled her to benefits like employer-sponsored health insurance but required her to be in the office five days a week. ECF No. 53-32 at 174:21–175:14; ECF No. 57-6 at 11.

The PPUC provides every new employee with an employee handbook. ECF No. 57-1 at 136:4–9. Josie received, reviewed, and signed a copy on the day she was hired. ECF No. 64-17 at 37:1–38:7. Relevant here, the handbook defines a full-time employee as one who is "regularly scheduled to work 32 hours per week." ECF No. 57-6 at 6. Employees earn sick time and may use such time to care for themselves or family members, provided that the employee gives as much notice as possible. *Id.* at 61–62. Further, if an employee needs more sick time than he or she has accrued, the employee could choose to be placed on an unpaid leave of absence. *Id.* at 62. Separately, employees who have worked at the PPUC for at least 12 months are "allowed to take up to 6 weeks of unpaid leave during any rolling 12-month period" to "recuperate or be treated for the employee's own serious health condition." *Id.* at 63.

Butcher and Cunningham believed Josie to be a strong worker. ECF No. 57-1 at 192:8–17; ECF No. 57-2 at 54:1–21; ECF No. 64-18 at 11:3–6. But there was one issue:

Josie's attendance. Josie first missed work at the end of March 2023, as she dealt with the death of a nephew. ECF No. 64-17 at 62:6–18. She thereafter missed work for her own sicknesses, her children's sicknesses, her children's school-related needs, or unexpected emergencies with her car or home. ECF No. 57-2 at 59:17–60:12. On September 1, 2023, Cunningham completed Josie's 6-month written review and noted that Josie "has not been able to contribute a full 40 hours of work each week consistently" and that the PPUC "would like to discuss ways to ensure full and consistent attendance." ECF No. 64-7 at 3. The review noted that Josie's absences caused stress for customers and "strain on the others in the office" who had to pick up Josie's work when she was absent. *Id.* at 5. The review otherwise noted that Josie did "an amazing job." *Id.* Josie also acknowledged that her "[u]nplanned absences" needed to improve but stated "[t]here are things I am doing personally to try to avoid the more manageable things." ECF No. 57-9.

Josie's attendance improved after the review, and she missed just two days of work for illness before December 4, 2023. ECF No. 64-4 at 3; ECF No. 57-2 at 81:5–8. But Josie missed most of that week to care for her older child's sickness. ECF No. 64-4 at 3. For her year-end review, Josie again identified her attendance "over the last year" as an area for improvement but stated that she believed it had improved. ECF No. 57-14 at 1. She added that the PPUC was "great in understanding" and that she did not believe the PPUC could do anything to help her. *Id.* Cunningham noted that Josie's "attendance had improved" but that "she recently had unplanned issues arise" and that PPUC's management would "continue to monitor and discuss as needed." ECF No. 64-8 at 3.

Josie had used all her allotted time off by the end of 2023 and no time carried over to 2024. ECF No. 64-17 at 72:7–22. But on the morning of January 8, 2024, Josie reminded Cunningham by text that Josie had requested the day off to take care of her dog. ECF No. 64-13 at 7. Cunningham responded, "I just can't remember if you had time off—should be fine but I can double check when I get in." *Id.* Josie acknowledged that she likely had no paid time off available but asked whether it was "okay [to] take it unpaid." *Id.* at 8. Cunningham responded that it "can be unpaid" but doing so made Cunningham "nervous" because she had to "keep [Josie] above 32hrs/week to maintain health benefits." *Id.* Cunningham also told Josie that Butcher "has been cracking down on making up time." *Id.* at 9. Cunningham ultimately let Josie take unpaid time off. *Id.*

Then, on January 16, Josie emailed Cunningham that she needed to take off January 23 because her older child had an immunology appointment and that the child was diagnosed with pneumonia and was "very very ill." ECF No. 53-12 at 2. Josie also stated that her son needed "this follow up care" because "he has had many illnesses in the last 6 months but 2 severe illnesses in the last month." *Id.* Things quickly worsened, and on the following morning, Josie texted Cunningham that she was taking her child to the hospital. ECF No. 57-13 at 4. Josie provided Cunningham with periodic updates throughout the day, including that her son was admitted to the emergency department and needed testing for "bacterial meningitis." ECF No. 64-13 at 10. Cunningham asked whether Josie would be at work the next day, and, after Josie responded that she did not know, Cunningham said "I'll have to do some sweet talking and get coverage adjusted" to make up for the absence. *Id.* at 10–11. That afternoon, Cunningham emailed Butcher to let him know about Josie's

absence. ECF No. 53-5 at 2–3. Cunningham wrote that Josie "does not have enough sick/PTO to cover today" and that Cunningham was "not going to offer a weekend 'makeup'" both because the PPUC had not agreed to that and Cunningham thought Josie would "take advantage of the offer." *Id.* at 3. Cunningham worried that weekend "makeup" work would become "a weekly issue." *Id.*

On the morning of January 18, Cunningham texted Josie to ask whether she was "out again" after Josie did not arrive at work. ECF No. 64-13 at 11. Josie confirmed that she would not be coming into work and later asked "about what medical documentation is needed for my work, or FMLA forms." *Id.* at 11–12. Cunningham responded that a doctor's note was necessary for an absence of more than three days and asked whether Josie was "asking about short-term disability." *Id.* Josie said, "I don't want to davel [sic] into disabilities as I don't think this is short or long term." *Id.* Josie just wanted to "make sure work has what they need to keep my job." *Id.* Cunningham responded that she would check with Butcher and asked how long Josie would be gone; Josie responded that she would need a few more days. *Id.* at 13. The two then discussed Josie's work responsibilities, and Cunningham said that if Josie missed time the following week Cunningham would "plan on pulling double duty and come in early/stay late" and would "deny all vaca[tion] requests from the others as I have to plan coverage." *Id.* at 14. Josie then sent a doctor's note to Cunningham which stated that her son was "diagnosed with asthma exacerbation and pneumonia." ECF No. 64-2 at 2–3.

Later that evening, Josie began applying for new jobs on Indeed.com. ECF No. 57-27 at 5. Josie explained that she did so after a heated phone call in which

Cunningham complained about Josie's absences caused by her children's illnesses and hospitalizations. ECF No. 66 ¶ 8. Josie did not want to leave the PPUC but began to worry that she would be terminated. *Id.*

Finally, on January 19, and after consulting with Butcher, Cunningham informed Josie that the PPUC was not covered by the FMLA but "we do have short term disability." ECF No. 64-13 at 15. Josie wrote, "Thank you for checking! I don't think short term disability is necessary!" *Id.*

### C. The PPUC Puts Josie on a Performance Improvement Plan

On the morning of January 19, Butcher and Cunningham began drafting a "performance improvement plan" ("PIP") for Josie. ECF No. 64-10. Josie returned to work on January 22. ECF No. 64-17 at 158:18–20. On January 23, Cunningham and Butcher presented the PIP to Josie. *Id.* at 159:4–160:9.

The PIP's purpose was to "define areas of concern, gaps in your work performance, reiterate the expectations of [the PPUC], and allow you the opportunity to demonstrate improvement and commitment." ECF No. 57-15 at 1. It listed just one area of concern: Josie's attendance. *Id.* The PIP explained that Josie was "away from the office for a total of 252.75 hours (or 6.3 weeks) in 2023 and most of these absences have been sudden, long lasting, and without advanced notice." *Id.* According to the PIP, Josie's absences "put[] a significant strain on the office and the team and jeopardize[] our ability to serve our customers effectively." *Id.* Finally, the PIP noted that the PPUC had "tried to be lenient and accommodate [Josie's] needs but it is now affecting her co-workers, jeopardizing team cohesion, impacting morale, and delaying projects." *Id.* The PIP asked Josie to commit

"to working 40 hours per week, every week," to establish a set work routine, to schedule "personal appointments outside of work hours," to respect her co-workers by minimizing absences, and to provide advance notice of time out of the office. *Id.* at 2.

The PIP informed Josie that she was "on probation for the next year," and that she would face escalating consequences each time she was "unable to log 40 hours (through a combination of work and paid time off)." *Id.* The first time Josie logged less than 40 but more than 32 hours, Cunningham would set a "very clear" work schedule for Josie and the PPUC would reduce her pay by $0.65 an hour. *Id.* The second instance would result in the requirement that Josie give two weeks' written notice of vacation time, and her pay would be reduced by an additional $0.65 an hour. *See id.* Upon a third violation, Josie would be terminated. *Id.* The PIP also stated that if Josie logged less than 32 hours in any given week, she would immediately be placed on part-time status and lose full-time benefits. *Id.*

Josie met with Cunningham and Butcher three times to discuss the PIP. ECF No. 64-17 at 161:5–9. First, on the day Josie received the PIP, Josie was instructed to take the PIP home, review it, and sign it. *Id.* at 161:14–22. The following morning, in anticipation of a second meeting between Josie and Cunningham, Butcher directed Cunningham to inform Josie:

> The Billing Clerk position is a 40 hour per week commitment. In order for [Josie] to continue her full-time employment with [the PPUC], we are requiring [that] her commitment be documented and placed in her personnel file (ie. signing the PIP). Alternatively, we can immediately switch her to part-time status and work with her to put together a specific schedule.

ECF No. 64-11 at 3. Butcher also told Cunningham to inform Josie that agreement to the PIP was a "requirement for continued employment." *Id.* at 2. Cunningham responded that she "could see [Josie] coming back stating she was pushed out or we did not work with her." *Id.*

Later that day, Josie told Cunningham that she would not sign the PIP because she felt it restricted her ability to attend follow-up medical appointments for her older child. ECF No. 64-17 at 162:13–18. Cunningham scheduled a third meeting with Butcher to discuss Josie's concerns. *Id.* at 163:5–10. During this third meeting, Josie reiterated that she would not sign the PIP because of the follow-up appointments. *Id.* at 164:11–13. Butcher explained that Josie needed to verbally commit to the PIP or he would deem her employment abandoned. *Id.* at 165:12–13. But neither Cunningham nor Butcher told Josie they would restrict her ability to schedule follow-up appointments. *Id.* at 164:24–165:2.

Ultimately, Josie agreed to a reduction to part-time status, although Josie explained that she did so because she felt she had no other option. *Id.* at 165:4–21, 173:13–19. Cunningham emailed Josie summarizing the agreement and noting "[p]er our discussion and your requests" Josie would be moved to part-time status, her schedule would fluctuate based on her weekly availability, her pay rate would not change, and Josie would not be required to sign the PIP. ECF No. 53-7 at 3–4. Cunningham further informed Josie that when Josie felt ready to return to full-time status, she could let the PPUC know. *Id.*

### D. Josie Seeks Medical Care and Resigns

Josie went to work the next day, January 25, but left almost immediately because she began to experience a panic attack. ECF No. 64-17 at 175:14–17. Josie emailed

Cunningham explaining that she was having a panic attack and then headed to the emergency room. ECF No. 53-7 at 2. Josie expressed her disagreement with Cunningham's characterization of the prior day's meeting; specifically, Josie disagreed that she requested part-time status. *Id.* Instead, Josie noted that she felt she had no other option because the PPUC was unwilling to give her time to attend her son's medical appointments. *Id.* At 12:58 p.m., Josie sent Butcher and Cunningham a doctor's note, which stated that Josie was in the emergency room and should be excused from work for the next seven days. ECF No. 57-17.

Butcher thereafter emailed Josie reminding Josie that the position was intended to be full time, that Josie had a history of working less than full time, and that the PIP was intended to fix the disconnect. ECF No. 57-19. He further reiterated that the PPUC presented Josie with the option to work full time or reduce to part-time work, and although she did not like either option, she eventually agreed to part-time work rather than leave her position. *Id.* Finally, Butcher explained that because Josie left work that day, the PPUC would interpret her absence as the first violation of the PIP and that a second violation would constitute job abandonment. *Id.*

That afternoon, Josie interviewed with a company called Inspire Communities ("Inspire"). ECF No. 64-17 at 198:21–199:4. She participated in another interview the next day, January 26, between 3:00 and 4:00 p.m. *Id.* at 200:1–19. Shortly after the second interview concluded, Josie emailed Cunningham and Butcher that "yesterday I experienced a medical emergency caused by a medical condition that interferes with a major life activity," that a doctor excused her from work for seven days, and that she would see a

"primary doctor on [January 29] to determine when I can return to work." ECF No. 64-12 at 6. Josie further stated that she would update Cunningham and Butcher "when I will be able to return to work." *Id.* Josie concluded, "I am currently on a leave protected by the FMLA, the ADA, and the MHRA." *Id.*

On January 29, Butcher responded to Josie's email by again requesting that Josie confirm a schedule for the week and stating that "nothing in any of our statements is in violation of any law, regulation, or policy." *Id.* at 5. Josie responded that the decision to drop her to part-time status after she requested protected leave was a clear violation of the law, and she requested to be reinstated to full-time status. *Id.* at 2. Josie also attached another doctor's note stating only that Josie "was seen on 1/29/24. Please excuse her through 2/1/24 due to medical conditions." *Id.* at 10.

That afternoon, Butcher and Cunningham posted a position on Indeed.com for a full-time billing clerk. ECF No. 57-24. Butcher and Cunningham both testified that their intention was to hire a full-time billing clerk in addition to Josie working part time. ECF No. 57-1 at 258:24–259:2; ECF No. 53-31 at 143:5–7. Josie first learned about the posting on January 31 and believed it meant that the PPUC planned to terminate her. ECF No. 64-14 at 2–3; ECF No. 66 ¶ 13.

Josie accepted a position with Inspire on February 1 and planned to start on February 19. ECF No. 64-17 at 200:23–201:7, 203:6–204:1; ECF No. 57-30. On that same day, Josie's attorney sent the PPUC a letter informing the PPUC that Josie had legal claims against the PPUC and attached two more doctors' notes. ECF No. 57-25. The first stated that Josie was undergoing medical care, needed medical leave until February 28, and that

she should receive four days off each month for her "condition." ECF No. 57-26. The second stated that Josie was seeking FMLA leave for "severe anxiety" and "poor focus." ECF No. 64-16 at 3–6.

The parties did not communicate again until February 12, 2024, when Josie emailed Butcher and Cunningham to resign her position because of "the intolerable conditions" and "hostile work environment." ECF No. 53-10. The resignation was to be effective February 16, 2024. *Id.* Josie started her new job with Inspire on February 20, 2024, where she still works. ECF No. 64-7 at 206:4–12, 219:9–220:2.

## II. Procedural Background

Josie filed this action on August 28, 2024, bringing nine total claims. *See generally* ECF No. 1. In Count 1, Josie alleges that the PPUC interfered with her FMLA rights and retaliated and discriminated against her for trying to exercise those rights. *Id.* ¶¶ 96–106. In Count 2, she alleges that the PPUC retaliated against her for trying to exercise her rights under Minnesota's Earned Sick and Safe Time Act ("ESST"), Minn. Stat. § 181.9445–.9948. ECF No. 1 ¶¶ 107–17. In Counts 3 and 4 (the "associational disability" claims), Josie alleges that the PPUC discriminated against her because of her association with someone with a disability, in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112(b)(4), and the Minnesota Human Rights Act ("MHRA"), Minn. Stat. § 363A.15(2). ECF No. 1 ¶¶ 118–33. In Counts 5 and 6 (the "disability discrimination" claims), she alleges that the PPUC discriminated against her because of her own disability in violation of the ADA, 42 U.S.C. § 12112(b)(1), and the MHRA, Minn. Stat. 363A.08, subd. 2. ECF No. 1 ¶¶ 134–43. And in Counts 7, 8, and 9 (together with Count 2, the

"retaliation claims"), she alleges that the PPUC retaliated against her for requesting accommodations under the ADA, 42 U.S.C. § 12203(a), or the MHRA, Minn. Stat. § 363A.15, and retaliated against her for reporting alleged violations of law to the PPUC in violation of Minnesota's Whistleblower Act ("MWA"), Minn. Stat. § 181.932. ECF No. 1 ¶¶ 154–78.

Both sides move for summary judgment. Josie seeks partial summary judgment and an order from the Court that the PPUC and the City can be considered "integrated employers" for purposes of meeting certain ADA and FMLA employee numerosity requirements. ECF Nos. 51, 52. Defendants move for summary judgment on all of Josie's claims. ECF Nos. 55, 56.

**ANALYSIS**

Summary judgment is proper only if "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." *Riedl v. Gen. Am. Life Ins.*, 248 F.3d 753, 756 (8th Cir. 2001) (citation omitted). At this procedural juncture, the Court does "not weigh the evidence, make credibility determinations, or attempt to discern the truth of any factual issue." *Avenoso v. Reliance Standard Life Ins. Co.*, 19 F.4th 1020, 1024 (8th Cir. 2021) (citation omitted). Additionally, the Court must view the facts in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). This approach is only "slightly modified" when a court is presented with cross-motions for summary judgment. *Fjelstad v. State Farm Ins. Co.*, 845 F. Supp. 2d 981, 984 (D. Minn. 2012). In such a case, the Court considers each party's motion in a light most favorable to the nonmoving party. *Id.*

## I. Whether the PPUC is Covered by the FMLA or the ADA

In general, the FMLA provides that an "eligible employee"—such as one that needs to care for the serious health condition of a "spouse, or a son, daughter, or parent"—"shall be entitled to a total of 12 workweeks of leave during any 12-month period." 29 U.S.C. § 2612(a)(1). Employers are prohibited from interfering with an employee's rights under the FMLA. An employer (1) may not "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" by the FMLA; and (2) may not "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" by the FMLA. *Id.* § 2615(a). The ADA similarly prohibits employers from discriminating against employees because they have a disability or are associated with someone with a disability. 42 U.S.C. § 12112. But the FMLA and the ADA do not apply to certain employers. Relevant here, the FMLA only applies to public agencies like the PPUC if the public agency "employ[s] 50 employees at the worksite or within 75 miles." 29 C.F.R. § 825.108(d). And the ADA only applies to employers with 15 or more employees. *See* 42 U.S.C. § 12111(5)(A).

It is undisputed that the PPUC employs only 13 employees, meaning it does not, by itself, meet the employee numerosity requirements of the FMLA or the ADA. ECF No. 57-1 at 19:20–20:3. But Josie argues that the PPUC's employee count can be combined with the City's under a "single entity" or "integrated employer" theory. ECF No. 52 at 17.

Josie is correct that, under both the FMLA and the ADA, two employers can be combined for purposes of the employee numerosity requirement in certain circumstances.

Indeed, there is a well-established test for when two *private* employers may be combined as one. As it relates to the ADA, courts use a common-law based test that considers four factors: (1) interrelation of operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership or financial control. *Baker v. Stuart Broad. Co.,* 560 F.2d 389, 392 (8th Cir. 1977) (adopting factors in the Title VII context to determine whether two related entities could be considered a single employer); *see Bradley v. Monarch Constr., Inc.*, 35 F. App'x 420, 421 (8th Cir. 2002) (per curiam) (affirming district court's use of Title VII integrated-employer test to consider whether employer met numerosity requirements under the ADA).

The same four-factor "integrated employer test" is used to determine "employer coverage and employee eligibility" for FMLA claims. 29 C.F.R. § 825.104(c)(2) (listing common management, interrelation between operations, centralized control of labor relations, and degree of common ownership/financial control as factors considered in determining whether two or more entities are an integrated employer). But the integrated employer analysis under the FMLA is slightly more complicated when the employer is a *public* one. That is because the FMLA's implementing regulations have a separate section, titled "Public Agency Coverage," which states:

> Whether two agencies of the same State or local government constitute the same public agency can only be determined on a case-by-case basis. One factor that would support a conclusion that two agencies are separate is whether they are treated separately for statistical purposes in the Census of Governments issued by the Bureau of the Census, U.S. Department of Commerce.

29 C.F.R. § 825.108(c)(1).[2]

As the FMLA rule indicates, whether two public agencies can be considered one employer is analyzed on a "case-by-case" basis. But what factors should be considered for purposes of this case-by-case analysis? The rule itself is silent, and there is very little case law fleshing out those factors. Certainly, one factor is the treatment of the entities by the Census of Governments. *Id.* But there must be more if the Census is just one factor. To fill in the gap, one judge in this District persuasively explained that the four-factor test from 29 C.F.R. § 825.104 provides a useful starting point. *Lieffring v. Prairieland Solid Waste Facility*, No. 19-cv-2812 (SRN/TNL), 2021 WL 2686319, at *8 (D. Minn. June 30, 2021). *Lieffring* further incorporated a list of factors found in a 2020 Department of Labor opinion letter:

> (1) whether the two agencies have separate payroll systems; (2) whether they have different retirement systems; (3) whether they have separate budgets and funding authorities; (4) whether each has the authority to sue and be sued in its own name; (5) whether they have separate hiring and other employment practices; (6) whether one employer controls the appointment of officers of the other agency; and (7) how state law treats the relationship between the two agencies.

---

[2] An earlier version of 29 C.F.R. § 825.108 stated that if there was any question about whether an entity was part of or separate from another public agency, the Census of Governments was "determinative." 29 C.F.R. § 825.108(c)(1) (2008). The Department of Labor amended the regulation in 2008 to make the Census of Governments "just one factor" and to allow "employment-related factors to play a greater role." U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter, FMLA2020-1-A, 2020 WL 122923, at *2 n.2 (Jan. 7, 2020).

*Id.* at *7 (quoting U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter, FMLA2020-1-A, 2020 WL 122923, at *2 (Jan. 7, 2020) (hereafter the "2020 Opinion Letter")).

The Court sees no reason to depart from the well-reasoned analysis of *Lieffring*. Nor do the parties, who both point to *Lieffring* as a guidepost. ECF No. 52 at 18; ECF No. 56 at 27. Therefore, the Court will consider the seven factors articulated in the 2020 Opinion Letter, *see Lieffring*, 2021 WL 2686319, at *7; "whether [the PPUC and the City] are treated separately for statistical purposes in the Census of Governments," 29 C.F.R. § 825.108(c)(1); and the four factors found in ADA case law, *see Bradley*, 35 F. App'x at 421, which are codified in the FMLA's implementing regulations, *see* 29 C.F.R. § 825.104(c)(2). This is, to say the least, a highly case-specific and factually intensive exercise.

**A. 2020 Opinion Letter Factors**

Based on the developed factual record before the Court at the summary judgment stage, the balance of factors identified in the 2020 Opinion Letter weigh against finding that the PPUC and the City are an integrated employer.

The factors favoring a single-employer determination are that the City controls the appointment of the PPUC's officers and the PPUC may not be independently sued. Relevant here, Minnesota law makes it a city's responsibility to establish a PUC and to appoint its commissioners, *see* Minn. Stat. §§ 412.331, 412.341, and further authorizes a city to abolish the PUC, *see id.* § 412.391. Each of these provisions suggests integration. *See* 2020 Opinion Letter, 2020 WL 122923, at *2 (identifying "whether one employer

controls the appointment of officers of the other agency" as a relevant factor). Further, the PPUC may not "sue or be sued in its own name." *Galob v. Sanborn*, 160 N.W.2d 262, 265 (Minn. 1968) (holding that a municipal power commission is not "a legal entity which could sue and be sued" because Minnesota law did not provide it that power); *see Lieffring*, 2021 WL 2686319, at *7 (identifying "whether each has the authority to sue and be sued in its own name" as a relevant factor); *see also Carmouche v. Marksville Hous. Auth.*, No. 12-cv-3023, 2013 WL 3049408, at *3 (W.D. La. June 17, 2023) (observing that the fact an entity could be sued was a strong indicator of its independence); *Miller v. County of Rockingham*, No. 5:06CV00053, 2007 WL 2317434, at *6 (W.D. Va. Aug. 9, 2007) (same).[3]

Most of the remaining 2020 Opinion Letter factors favor a determination that the PPUC and the City are not a single employer. For instance, the payroll and retirement systems of the PPUC are separate from the City's. *See* ECF No. 57-5 at 76; *see also* 2020 Opinion Letter, 2020 WL 122923, at *2 (listing "whether the two agencies have separate

---

[3] The PPUC argues that it can sue and be sued, despite *Galob*. But its argument turns on the fact that it is now consenting to be sued and did the same thing in 2017. *See* ECF No. 56 at 31–32 (referencing *Johnson v. Princeton Pub. Utilities Comm'n*, 899 N.W.2d 860 (Minn. Ct. App. 2017)). Had the PPUC put the question to either this Court or the prior state court, *Galob* would have controlled because Minnesota law requires that a public agency's "enabling statute . . . must provide the entity the ability to sue or be sued in its own name" before it can sue or be sued. *Doran 610 Apartments, LLC v. State ex rel. Walz*, No. A21-0869, 2022 WL 764229, at *2 (Minn. Ct. App. Mar. 14, 2022); *Shimer v. Shingobee Island Water & Sewer Comm'n*, No. 02-cv-953 (JRT/FLN), 2003 WL 1610788, at *4 (D. Minn. Mar. 18, 2003) ("[A]bsent specific statutory authority, such subordinate entities do not have the capacity to sue or be sued."). The PPUC points to no statutory authority permitting it to sue or be sued.

payroll systems" and "whether they have different retirement systems" as two relevant factors). The PPUC's funding streams and budget are also managed independently of the City. *See* ECF No. 57-1 at 20:8–24; ECF No. 57-4 at 80: 13–18; *see also* 2020 Opinion Letter, 2020 WL 122923, at *2 (considering "whether [agencies] have separate budgets and funding authorities" as a relevant factor). And pursuant to state law, a PUC is authorized "to extend and to modify or rebuild any public utility and to do anything it deems necessary for its proper and efficient operation"; "to enter into necessary contracts"; "to buy all fuel and supplies"; and "to fix rates and to adopt reasonable rules and regulations for utility service." Minn. Stat. § 412.361. These financial and operational decisions are completely independent of the City. *See* 2020 Opinion Letter, 2020 WL 122923, at *2 (considering an agency's ability to "enter into contracts on its own behalf" and to "acquire, hold, possess, and dispose of real and personal property" as "factors that indicate its independence from other public entities"); *Carmouche*, 2013 WL 3049408, at *3 (holding an agency was independent when it was "solely responsible for [its] own debts" and owned its own properties); *Lieffring*, 2021 WL 2686319, at *8 (holding an agency that "maintains its own bank accounts" suggests independence). Finally, the PPUC may, independently of the City, "employ all necessary help for the management and operation of the public utility, prescribe duties of officers and employees and fix their compensation." Minn. Stat. § 412.361, subd. 2. The fact that the PPUC "hires, fires, and pays its own employees [and] maintains its own personnel policy manuals" suggests independence from the City. *Lieffring*, 2021 WL 2686319, at *8; *see* 2020 Opinion Letter, 2020 WL 122923, at *2 (identifying

"whether [agencies] have separate hiring and other employment practices" as a relevant factor).

For the last factor—"how state law treats the relationship between the two agencies," *see* 2020 Opinion Letter, 2020 WL 122923, at *2—some aspects of state law suggest that the PPUC and the City are integrated, while others suggest independence. Fundamentally, neither side can point to any "state law definitively establish[ing] that" the PPUC is or is not "a separate government." *Fain v. Wayne Cnty. Auditor's Off.*, 388 F.3d 257, 262 (7th Cir. 2004). This factor is therefore neutral in the Court's analysis.

Overall, two of the 2020 Opinion Letter factors favor such a finding, four factors weigh against such a finding, and one factor is neutral.

**B. The Census of Governments**

Prior to the 2008 amendment to 29 C.F.R. § 825.108, the Census of Governments was "determinative" as to whether two public agencies could be considered a single employer. 2020 Opinion Letter, 2020 WL 122923, at *2 n.2. While it is still significant, it is now only "one factor" to be considered. 29 C.F.R. § 825.108(c)(1). Here, that factor favors finding that the PPUC and the City are a single employer.

The Census of Governments identifies the scope and nature of the nation's state and local government sector; classifies local government organizations, powers, and activities; and measures federal, state, and local fiscal relationships. U.S. Census Bureau, About Census of Governments, https://perma.cc/ALL4-MG5V. Josie points to the most recent "Census of Governments," which does not list the PPUC as a separate legal entity. *See generally* ECF No. 53-30. Defendants do not argue otherwise. ECF No. 59 at 4–5. Instead,

Defendants contend that the Census's tabulation is wrong and assert that the documents it submitted to "the Census of Governments unequivocally show PPUC is treated as a separate entity from the City." ECF No. 59 at 4. Defendants' argument is unconvincing. That the PPUC believes itself to be an independent entity has no relevance here; 29 C.F.R. § 825.108 merely asks whether the PPUC *is* "treated separately for statistical purposes in the Census of Governments," not whether it *should be* treated separately. 29 C.F.R. § 825.108(c)(1). It is not. And the Court cannot second guess the Census Bureau's determination simply because the PPUC disagrees with it.[4]

Yet the Census of Governments is, of course, just one of many non-dispositive factors relevant to the Court's analysis. *See Lieffring*, 2021 WL 2686319, at *8 (declining to hold as a matter of law that a public agency was a separate entity even though it was listed on the Census of Governments as a separate entity); 2020 Opinion Letter, 2020 WL 122923, at *2 (finding agency to be a separate entity even though the Census listed it as a subordinate agency). Here, the Census of Governments factor favors finding that the PPUC and the City are a single employer.

### C. ADA Factors and FMLA's Implementing Regulations

For those keeping score: at this point, three factors favor concluding that the PPUC and the City form a single employer, four factors weigh against such a finding, and one

[4] The PPUC's belief apparently had no relevance to the U.S. Census Bureau either, who despite (presumably) receiving the PPUC's documents concluded that the PPUC was not a separate legal entity.

factor is neutral. The remaining factors from ADA case law and FMLA's implementing regulations suggest that the PPUC is a separate entity from the City.

First, there is no common management between the agencies: the PPUC is run by Butcher, and the City does not manage the PPUC's affairs. ECF No. 57-1 at 21:6–12; *see also Miller*, 2007 WL 2317434, at *8 (finding no common management where the public agency was "managed entirely by its own Executive Director, which is independently selected by its own Board of Directors," and the director had control of "the day-to-day management of the [agency] in all respects"). Second and likewise, there is no centralized control of labor relations: the ability to hire, fire, and pay employees is exclusively the PPUC's. ECF No. 57-5 at 76:11–15; *see* Minn. Stat. § 412.361, subd. 2. Nor does the City have financial ownership or control of the PPUC. As to the third factor, the PPUC's budget is drawn exclusively from funds it raises from its customers. ECF No. 57-1 at 20:8–24.

The only close call of these four ADA factors is the interrelation of operations between the PPUC and the City. For instance, the City and the PPUC communicate frequently about the wastewater payments the PPUC collects for the City. ECF No. 57-1 at 39:17–22, 40:9–17, 47:7–49:2. And the fact that Butcher attends nearly every meeting of the City's "internal department heads" suggests some interplay. ECF No. 53-33 at 10:8–13; 11:5–8. But there is no evidence that the City Council directs him, or the PPUC, in any one manner. Nor do the PPUC and the City share property or responsibilities. ECF No. 57-1 at 24:15–25:8; *see Fain*, 388 F.3d at 262 (finding entity closely related to a municipality when the entity's office was "located in" the municipality's administrative building, the municipality issued the entity's paychecks, and the entity acted in a

"secretarial capacity" for the municipality). At best, the undisputed record reflects that the PPUC and the City share a loose operational connection.

Overall, some of the relevant factors favor Josie's position and some favor Defendants' position. Because the record contains facts supporting both positions and because a reasonable jury could weigh those facts differently and draw different conclusions, the Court denies summary judgment to both parties on this ground. *See Lieffring*, 2021 WL 2686319, at *9 (denying summary judgment when entities were "largely separate on paper" but "the record contains ample facts suggesting that their management and operations are sufficiently enmeshed to support the conclusion that they are joint or integrated employers under the FMLA [and] the ADA"); *see also Avenoso*, 19 F.4th at 1024 (citation omitted) (explaining that district courts deciding motions for summary judgment may not "weigh the evidence" or "attempt to discern the truth of any factual issue"). As a result, Josie's motion for partial summary judgment is denied in its entirety. And because Defendants' motion for summary judgment as to Josie's FMLA claim rests solely on whether the PPUC is an eligible employer, *see* ECF No. 56 at 25–34, Defendants' motion is denied as to Josie's FMLA claim alleged in Count 1, ECF No. 1 ¶¶ 96–106.

## II. Associational Disability Claims

The PPUC next moves for summary judgment on Josie's associational disability claims. ECF No. 56 at 35–38. Both the ADA and the MHRA make it unlawful for an employer to take adverse employment action against an employee because of a "known disability of an individual with whom" the employee "is known to have a relationship."

42 U.S.C. § 12112(b)(4); *see* Minn. Stat. § 363A.15(2) (prohibiting reprisals against an employee because the employee "associated with a person or group of persons who are disabled"). Such "associational disability" discrimination claims are analyzed under the burden-shifting framework articulated in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973).[5] *See Kratzer v. Rockwell Collins, Inc.*, 398 F.3d 1040, 1044 (8th Cir. 2005) (applying *McDonnell Douglas* framework to ADA claims); *Hoover v. Norwest Priv. Mortg. Banking*, 632 N.W.2d 534, 542, 548 (Minn. 2001) (applying *McDonnell Douglas* framework to both discrimination and reprisal claims under the MHRA).

For Josie to survive summary judgment, she first must make a prima facie showing of discrimination by demonstrating: (1) an adverse employment action; (2) that she was qualified for the job of billing clerk; (3) that the PPUC knew she had a relative with a disability; and (4) the circumstances give rise to an inference of discrimination. *Kennedy v. Heritage of Edina, Inc.*, No. 13-cv-71 (DSD/JJG), 2014 WL 3828167, at *5 (D. Minn. Aug. 4, 2014). If Josie makes a prima facie case, the Defendants bear "the 'non-onerous' burden of production to offer a legitimate, non-discriminatory (or non-retaliatory, in the case of a reprisal claim) reason for her termination." *Malark v. RBC Cap. Markets, LLC*, No. 18-cv-3179 (ECT/TNL), 2020 WL 6064508, at *11 (D. Minn. Oct. 14, 2020) (quoting *Montes v. Greater Twin Cities Youth Symphonies*, 540 F.3d 852, 857–58 (8th Cir. 2008)).

---

[5] Claims arising under the MHRA "are analyzed using the same standard applied to ADA claims," so courts review the claims simultaneously. *Brunckhorst v. City of Oak Park Heights*, 914 F.3d 1177, 1182 (8th Cir. 2019) (citation modified) (quoting *Philip v. Ford Motor Co.*, 328 F.3d 1020, 1023 n.3 (8th Cir. 2003)).

If the Defendants do not do so, "the burden of proof then shifts back" to Josie to show that the Defendants' "reason for the employment action was a pretext for intentional discrimination (or reprisal)." *Id.* (citing *Montes*, 540 F.3d at 858).

Defendants argue that Josie fails to make a prima facie showing because the PPUC did not take adverse employment action against her and, even if the Defendants did, the PPUC did not know that her child was disabled at the time. ECF No. 56 at 38. The Court agrees with the latter argument.

The ADA and the MHRA make clear that only adverse employment actions that are imposed "because of the *known disability* of an individual with whom the qualified individual is known to have a relationship" constitute unlawful discrimination. 42 U.S.C. § 12112(b)(4) (emphasis added); *see* Minn. Stat. § 363A.15(2); *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1003 (8th Cir. 2012) (explaining that a plaintiff "must prove that the employer was motivated by knowledge of" the associational disability). This means that not only must the associated individual have a disability under the ADA or MHRA, *see RHJ Med. Ctr., Inc. v. City of DuBois,* 564 F. App'x 660, 665 (3d Cir. 2014), but also that the employer knew the associated individual was disabled, *see Pulczinski*, 691 F.3d at 1003.

An individual is disabled under the ADA and the MHRA when the individual has "a physical or mental impairment that substantially limits one or more major life activities," has a record of such an impairment, or is "regarded as having such an impairment." 42 U.S.C. § 12102(1)(c); *see* Minn. Stat. § 363A.03 subd. 12. Major life activities under the ADA "are basic activities that the average person can perform with little or no

difficulty," *Battle v. United Parcel Serv., Inc.*, 438 F.3d 856, 861 (8th Cir. 2006), and whether a substantial limitation exists depends on things such as "the difficulty, effort, or time required to perform a major life activity," *Rinehart v. Weitzell*, 964 F.3d 684, 688 (8th Cir. 2020) (citation omitted).

Nothing in the record suggests that the PPUC knew that Josie's child suffered from an impairment that substantially limits one or more major life activities. Both parties acknowledge that the PPUC was aware, by January 16, 2024, that Josie's son was sick. *See* ECF No. 53-12 at 2 (Josie emailing the PPUC that she was taking the child to an "immunology appointment" because of an illness). The PPUC was even informed, as of January 18, of the general nature of the child's illness, such as potential "bacterial meningitis," ECF No. 64-13 at 10, or "asthma exacerbation and pneumonia," ECF No. 64-2 at 2–3, and that the child "had many illnesses in the last 6 months but 2 severe illnesses in the last month," ECF No. 53-12 at 2. A "diagnosis, standing alone," however, is insufficient to qualify someone as disabled without a further showing that the diagnosed illness or condition substantially limits a major life activity. *Kirkeberg v. Canadian Pac. Ry.*, 619 F.3d 898, 903 (8th Cir. 2010) (citation omitted); *see Andrews v. Tri Star Sports & Ent. Grp., Inc.*, No. 23-5700, 2024 WL 3888127, at *3 (6th Cir. Aug. 21, 2024) (holding that plaintiff failed to show a genuine dispute of material fact as to whether she was disabled because she failed to offer evidence showing how her asthma substantially limited major life activities); *Taylor v. City of Fridley*, 659 F. Supp. 2d 1029, 1047 (D. Minn. 2009) (same). Based on the record, Josie only ever told the PPUC of her son's illnesses, not that those illnesses substantially limited any of his major life activities.

Josie contends that she told the PPUC that her child's illnesses would result in "regular appointments with an immunologist and pulmonologist." ECF No. 63 at 25. But even if Josie's child needed monthly appointments,[6] such appointments do not, on their own, establish a disability. That is because they do not show the substantial limitation of a major life activity, which is a basic activity "that the average person can perform with little or no difficulty." *Battle*, 438 F.3d at 861. The ADA lists tasks such as "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working" as major life activities. 42 U.S.C. § 12102(2). Needing monthly appointments to manage illness does not, on its face, implicate any such activity. *See Nilles v. Givaudan Flavors Corp.*, 521 F. App'x 364, 369 (6th Cir. 2013) (holding that employer had no notice of disability where employer "only knew that [plaintiff] had taken two leaves of absence, each for less than a month and separated by over a year, and that [plaintiff] was seeing several doctors and had had an MRI"); *Sever v. Henderson*, 381 F.

[6] The Court is not so sure Josie informed the PPUC that her child required regular appointments. For support, Josie cites a single text message she sent to Cunningham on January 18, 2024, after Cunningham asked if Josie was seeking FMLA leave. In response, Josie stated that she would "[p]otentially" need "FMLA for like monthly appointments for [the child]. The doctor is in here now and he will need to follow up with immunology in office and pulmonology. Those are just like [onesie] twosie appointments." ECF No. 64-13 at 13. In other words, Josie told Cunningham that her son's monthly appointments were only "potentially" needed and that the only known appointments were one-time follow-ups. And within the same series of text messages, Josie told Cunningham that she did not think the child's illness was "short or long term," and that doctors did not expect that the child needed long-term hospitalization. *Id.* at 12–13. It is therefore not clear, as Josie now contends, that Josie informed the PPUC that her child would require "regular appointments," or that his sickness was even particularly serious.

Supp. 2d 405, 418 (M.D. Pa. 2005) ("[S]imply informing an employer of a particular condition is not tantamount to providing the employer with knowledge that the employee is substantially limited in some major life activity.").

Josie points to *Adams v. Persona, Inc.*, 124 F. Supp. 3d 973, 984 (D.S.D. 2015), for the proposition that an employer's knowledge that "an employee's child . . . 'required treatment' for their illness" is sufficient to satisfy the notice requirement of the prima facie case. ECF No. 63 at 25–26. But that court was considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) and merely held that an employer's knowledge that an employee's daughter had "an autoimmune disease requiring transfusion treatments every six to eight weeks" was sufficient to state an associational disability discrimination claim. *Id.* at 977. This case is at summary judgment and, simply put, the developed facts show no genuine dispute that would allow a reasonable jury to conclude that the PPUC knew about Josie's child's alleged disability. *Worrall*, 2023 WL 8464935, at *4 (holding the employee must "establish that [employer] was aware of the limitations caused by [relative's] condition"); *see Huber v. Westar Foods, Inc.*, 139 F.4th 615, 620 (8th Cir. 2025) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)) ("A genuine issue for trial exists when 'a reasonable jury could return a verdict for the nonmoving party.'"). Accordingly, the Court grants Defendants' motion for summary judgment on Josie's associational disability claims (Counts 3 and 4).

**III. Disability Discrimination Claims**

Josie also brings disability discrimination claims on behalf of herself, asserting that the PPUC constructively discharged her after she informed the PPUC that she had a

disability. ECF No. 1 ¶¶ 134–53. Like associational disability discrimination, both the ADA and the MHRA prohibit an employer from discriminating against an employee because of the employee's own disability. *See* 42 U.S.C. § 12112(a); Minn. Stat. § 363A.08, subd. 2; *see also Hustvet v. Allina Health Sys.*, 910 F.3d 399, 409 (8th Cir. 2018). No party argues that there is direct evidence of discrimination, so Josie's disability discrimination claims are likewise subject to the *McDonnell Douglas* burden-shifting framework. *Oehmke v. Medtronic, Inc.*, 844 F.3d 748, 755 (8th Cir. 2016). To establish a prima facie case of discrimination based on disability, Josie must show: (1) a qualifying disability; (2) qualifications to perform the essential functions of her position with or without reasonable accommodation; and (3) an adverse employment action due to her disability. *Kelleher v. Wal-Mart Stores, Inc.*, 817 F.3d 624, 631 (8th Cir. 2016). If she does so, the burden shifts to the PPUC to "articulate a legitimate nondiscriminatory reason for the adverse employment action." *EEOC v. Prod. Fabricators, Inc.*, 763 F.3d 963, 969 (8th Cir. 2014). "If such reason is provided, the burden shifts back to [Josie] to show that the [PPUC]'s proffered reason is merely a pretext for intentional discrimination." *Id.*

Josie does not make a prima facie showing because she does not show that the PPUC took adverse action *because of* her disability. Of course, "to establish discrimination because of a disability, an employer must know of the disability." *Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 380 (3d Cir. 2002); *see also Liljedahl v. Ryder Student Transp. Servs., Inc.*, 341 F.3d 836, 842 (8th Cir. 2003) ("Without knowledge of [employee's] emphysema or breathing problems, [employer] could not have discriminated against [employee] because of them.").

Josie contends that the PPUC became aware of her disability on January 25, 2024, when she left work early, informed the PPUC that she was having a "panic attack," ECF No. 63 at 26, and later sent a doctor's note that she was in the emergency room and should be excused from work for the next seven days because of an "acute medical concern." ECF No. 57-17. But this provided the PPUC nothing more than information that Josie had a single panic attack and needed a week off work, which did not put the PPUC on notice that Josie had an impairment that substantially limited a major life activity. *Knight v. McCarthy*, 439 F. Supp. 3d 744, 760 (E.D. Va. 2020) (holding that a "supervisor's knowledge of a single panic attack is insufficient to establish disability"); *Nelson v. City of Philadelphia*, No. 2:24-cv-4821-GAW, 2025 WL 1139342, at *6 (E.D. Pa. Apr. 17, 2025) ("There is no reasonable understanding of the word disability, either in plain English or under legal doctrine, which could include within it a single panic attack . . . .").

Josie points to follow-up emails and accompanying documentation to support her claim that she put the PPUC on notice of her disability by January 29, 2024. ECF No. 63 at 26. For instance, on January 26, Josie emailed Cunningham and Butcher stating that "yesterday I experienced a medical emergency caused by a medical condition that interferes with a major life activity," and "I will update you when I will be able to return to work." ECF No. 64-12 at 6. Josie also sent a doctor's note stating that Josie "was seen on 1/29/24. Please excuse her through 2/1/24 for medical conditions." *Id.* at 10. While generically invoking the language of the ADA here in referencing a "major life activity," these communications still do not put the PPUC on notice of any impairment, let alone one that substantially limited a major life activity. *Heisler v. Metro. Council*, 339 F.3d 622, 628

(8th Cir. 2003) ("[B]ald assertions that one is limited in a major life activity are insufficient to withstand summary judgment.").

Finally, Josie points to her attorney's February 1, 2024 letter to the PPUC, asserting that Josie had ADA claims against the PPUC. ECF No. 57-25. Enclosed were two doctors' notes explaining that Josie needed time off work, including up to four days off each month, ECF No. 57-26, and that Josie suffered from "severe anxiety" and "poor focus," ECF No. 64-16 at 3–6. But the February letter does not establish any connection between Josie's purported impairment (anxiety) and a resulting limitation of a major life activity. *See Wenzel v. Mo.–Am. Water Co.*, 404 F.3d 1038, 1041 (8th Cir. 2005) (citation omitted) ("[A] limiting but not disabling restriction also cannot be a disability within the meaning of the ADA."); *Walz v. Ameriprise Fin., Inc.*, 779 F.3d 842, 846 (8th Cir. 2015) (rejecting ADA claim because even if employer was aware that plaintiff "suffered from bipolar disorder," employee provided no facts that the employer was aware of any "resulting limitations"); *Wells v. Winnebago County*, 820 F.3d 864, 867 (7th Cir. 2016) ("Many people suffer anxiety without being disabled by it.").

The bottom line is that, even if Josie's anxiety substantially limited a major life activity, the PPUC was never notified of that fact beyond being told, in a conclusory fashion, that it does. That does not create a genuine dispute of material fact as to whether the PPUC knew Josie was disabled or regarded her as being disabled. *Segal v. Metro. Council*, 29 F.4th 399, 403 (8th Cir. 2022) (citation omitted) ("To establish a genuine issue of material fact, [the plaintiff] may not merely point to self-serving allegations, but must substantiate allegations with sufficient probative evidence that would permit a finding in

[her] favor." (internal quotation marks omitted)). The Court grants Defendants' motion for summary judgment on Josie's disability discrimination claims (Counts 5 and 6).

**IV. Retaliation Claims**

Finally, Josie alleges a variety of retaliation claims. In Count 2, she alleges that the PPUC retaliated against her for trying to exercise her rights under the ESST. ECF No. 1 ¶¶ 107–17. In Counts 7 and 8, she alleges that the PPUC retaliated against her for requesting reasonable accommodation for her disability, in violation of the ADA and MHRA. *See id.* ¶¶ 154–69. And in Count 9, she alleges that the PPUC retaliated against her in violation of the Whistleblower Act for reporting the PPUC's own violations of the law. *Id.* ¶¶ 170–78.

Both sides agree that Josie's retaliation claims are subject to the *McDonnell Douglas* burden-shifting test. ECF No. 56 at 45; ECF No. 63 at 36; *see also Liles v. C.S. McCrossan, Inc.*, 851 F.3d 810, 818 (8th Cir. 2017) (citation omitted) (applying *McDonnell Douglas* to ADA and MHRA retaliation claims); *Scarborough v. Federated Mut. Ins. Co.*, 996 F.3d 499, 505 (8th Cir. 2021) (applying *McDonnell Douglas* to MWA claims). In the context of retaliation claims, to make a prima facie case, Josie must show: (1) she "engaged in statutorily protected activity"; (2) Defendants "took an adverse action" against her; and (3) there is a "causal connection between the adverse action and the protected activity." *Hustvet*, 910 F.3d at 412. If Josie does so, the burden shifts to Defendants "to produce a non-retaliatory reason" for the adverse action. *Id.* (citation omitted). Finally, if Defendants proffer such a reason, "the burden of production shifts again" to Josie to "present evidence that the proffered reason for [the adverse action] was pretext." *Id.*

The PPUC seeks summary judgment exclusively on the grounds that it never took adverse employment action against Josie. *See* ECF No. 56 at 3 (defining its statement of the issue as whether "Plaintiff [can] establish reprisal and/or retaliation under the MHRA, the MWA, or ESST where no adverse action was taken and no reasonable person would have found the environment intolerable"); *id.* at 43 (asserting that the retaliation claims "must be dismissed as there was no adverse employment action by PPUC and plaintiff is unable to establish constructive discharge"). Indeed, that is how Josie read Defendants' motion. *See* ECF No. 63 at 37 ("Defendants' only argument with respect to Josie's retaliation claims is that they did not take adverse employment actions against her."). Defendants did not contest Josie's reading of their argument in their reply brief. *See, e.g.*, ECF No. 70 at 6 ("[P]laintiff has failed to identify any adverse action taken against her in retaliation for protected conduct."). And at the hearing for Defendants' motion, the Court explicitly asked Defendants if that was the only basis on which they sought summary judgment, and Defendants confirmed that understanding. As a result, the only issue properly before the Court is whether the PPUC took adverse action against Josie. *See Montgomery v. City of Ames*, 749 F.3d 689, 697 (8th Cir. 2014) ("A district court commits reversible error by granting summary judgment on an issue not raised or discussed by the parties if the losing party did not have notice and an opportunity to respond."); *see also Shanner v. United States*, 998 F.3d 822, 826 (8th Cir. 2021) (holding the district court committed error in granting summary judgment on parts of a negligence claim that were "not raised by either party during the summary judgment proceedings").

Adverse action in a retaliation case occurs "when the employer engages in conduct that would dissuade a reasonable employee from making a discrimination claim." *Quinn v. St. Louis County*, 653 F.3d 745, 751 (8th Cir. 2011). Here, Josie raises three distinct adverse employment actions: (1) Defendants placing her on the PIP; (2) Defendants reducing her to part-time status; and (3) Defendants constructively discharging her from her employment. ECF No. 63 at 26.

A demotion to part-time status constitutes a potentially retaliatory action. *See, e.g.*, *Bahr v. Capella Univ.*, 788 N.W.2d 76, 83 (Minn. 2010) (explaining that under the MHRA, "[a]n adverse employment action must include some tangible change in duties or working conditions"); *Mell v. Minn. State Agric. Soc'y*, 557 F. Supp. 3d 902, 917 (D. Minn. 2021) (holding that an employer's decision to "cut [an employee's] hours from full time to part time" could constitute adverse employment action). Defendants do not argue otherwise. Instead, Defendants argue that Josie "was moved to part-time status at her own request after she could not commit to a full-time schedule," that Josie "was not forced by anyone at PPUC to change her employment status," and that Josie "was not demoted." ECF No. 56 at 41.

The Court concludes that there is a genuine dispute about whether Josie voluntarily requested to move to part-time status. Indeed, the PPUC presented Josie with the PIP—which threatened a reduction in pay and eventual termination—on January 23, 2024. ECF No. 57-15. Josie was told to review the PIP and sign it by the next day. ECF No. 64-17 at 161:14–22. The following morning, Butcher told Cunningham that Josie had two options: agree to the PIP or agree to move to part-time status. ECF No. 64-11 at 3. If Josie

did not commit to the PIP, she would be fired. *Id.* at 2. But Josie, both contemporaneously and in her deposition, asserted that she could *not* agree to the PIP because she had to attend follow-up medical appointments in the upcoming weeks and would necessarily violate the PIP almost immediately. ECF No. 64-17 at 165:4–21; ECF No. 53-7 at 2. Yet Butcher demanded Josie's answer that day. *Id.* at 165:12–13. As a result, Josie says, she was "forced to make" the decision to accept the demotion to part-time status. *Id.* at 173:19.

Viewing this evidence in the light most favorable to Josie, as the Court must at the summary judgment stage, she was effectively pressured to move to part-time status because she did not agree to the PIP on January 24. Her decision to accept part-time status (the only other proposal offered by Butcher and Cunningham) was nothing short of a Hobson's choice. *United States v. Washington*, 596 F.3d 926, 938 n.13 (8th Cir. 2010) (quotation omitted) ("A Hobson's choice is an apparently free choice with no real alternative."); *see Moll v. Telesector Res. Grp., Inc.*, 94 F.4th 218, 242–43 (2d Cir. 2024) (reversing grant of summary judgment on retaliation claim when employer made employee choose between three undesirable employment options, "two of which a rational juror would be entitled to view as mirages that were temporally or substantively unacceptable"); *Marroquin v. City of Pasadena*, 524 F. Supp. 2d 857, 865 (S.D. Tex. 2007) (declining to grant summary judgment on retaliation claim when employer presented the employee with the option to transfer to a job he did not want or be fired).[7] Because a reasonable jury could dispute the

[7] Defendants tacitly acknowledge this point in their reply brief by asserting that "while Plaintiff contests that she voluntarily went to part-time status, such a dispute does not preclude summary judgment. The move to part-time status was the result of Plaintiff

voluntariness of Josie's move to part-time status, Josie's claim that Defendants retaliated against her by placing her on part-time status survives summary judgment.

But the same cannot be said for Josie's alternative arguments. First, as to the PIP, the Eighth Circuit has squarely held that, even under the more lenient "retaliation" standard for adverse employment action, placement on a PIP is not adverse employment action. *Bernard v. St. Jude Med. S.C., Inc.*, 398 F. Supp. 3d 439, 461 (D. Minn. 2019) (citing *Fiero v. CSG Sys., Inc.*, 759 F.3d 874, 880 n.2 (8th Cir. 2014)); *see also Henry v. Ind. Sch. Dist. #625*, 988 N.W.2d 868, 890 (Minn. 2023) (quoting *Bernard*, 398 F. Supp. 3d at 461–62) (noting "the placement of an employee on a PIP does not, by itself, constitute an adverse employment action, particularly when the PIP is 'reasonable' and/or 'minimally onerous'").

Josie asserts that this was not an ordinary PIP because it "included automatic reductions in pay for any use of leave" and "threatened termination of employment under some circumstances." ECF No. 63 at 27. But simply because a PIP carries serious consequences for noncompliance does not transform it into adverse employment action. *Fischer v. Andersen Corp.*, 483 F.3d 553, 554 n.2, 555 (8th Cir. 2007) (explaining that a PIP generally carries with it the chance of consequences for noncompliance and that a PIP

refusing to commit to work 40 hours per week, period." ECF No. 70 at 3. But this is precisely the point: it was arguably not Josie's choice to move to part-time status, and if it was not her choice, then a demotion to part-time status constitutes adverse employment action. *See Mell*, 557 F. Supp. 3d at 917. Whether the PPUC was justified in forcing Josie to choose between these alternatives is a separate question addressed by other elements of the *McDonnell Douglas* burden-shifting analysis. But the PPUC does not make those arguments here.

was not adverse action "just because it was imposed on [an employee] and carried a risk of termination"); *see also Kania v. Flint Grp.*, No. 21-cv-1845 (DWF/DLM), 2023 WL 4546428, at *2, *6 (D. Minn. July 14, 2023) (holding that failure to meet a PIP's requirements that resulted in termination did not make the PIP itself an adverse employment action); *Bernard*, 398 F. Supp. 3d at 454, 461 (requiring adherence to PIP "in order to avoid further disciplinary action, such as termination," does not make the PIP an adverse action).

Josie also asserts that the PIP was "unreasonable" because "it would have required her to forgo her right to take any form of protected leave." ECF No. 63 at 28. But that is not what the PIP says. *See Wilson v. Int'l Bus. Mach. Corp.*, 62 F.3d 237, 241 (8th Cir. 1995) (explaining that to withstand summary judgment the nonmoving party "must substantiate h[er] allegations with sufficient probative evidence" (alterations in original)). Instead, the PIP simply required Josie to log "40 hours (through a combination of work and paid time off)." ECF No. 57-15 at 2. Nor was Josie told that she was restricted by the PIP from taking leave she was entitled to take. ECF No. 64-17 at 162–64. And Josie does not argue that the PIP's expectation that she work or log 40 hours each week is, by itself, anything but "reasonable, minimally onerous, and easily achievable." *Baker v. City of Woodbury*, No. 20-cv-1787 (DSD/DLM), 2023 WL 8809996, at *9 (D. Minn. Dec. 20, 2023).

For similar reasons, Josie's argument that she was constructively discharged fails. To prove constructive discharge, a plaintiff must show: (1) she was discriminated against by her employer "to the point where a reasonable person in [her] position would have felt

compelled to resign," and (2) she "actually resigned." *Norgren v. Minn. Dep't of Hum. Servs.*, 96 F.4th 1048, 1056 (8th Cir. 2024) (quoting *Green v. Brennan*, 578 U.S. 547, 555 (2016)). The "intolerability of working conditions is judged by an objective standard, not the employee's subjective feelings." *Garrison v. Dep't of Rev. State of Minn.*, No. 23-cv-03485 (KMM/DTS), 2024 WL 4239253, at *6 (D. Minn. Sept. 19, 2024). The analysis involves consideration of "all of the attendant circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Norgren*, 96 F.4th at 1056 (citation omitted).

Josie argues that the PPUC subjected her to "abuse" by (1) forcing her to choose between waiving her right to take protected leave and a demotion or termination; (2) forcing her into part-time status; and (3) posting an opening on Indeed.com for a full-time billing clerk. ECF No. 63 at 30–31. No record evidence supports the first assertion, as the Court noted above. Nor does Josie cite evidence supporting the view that a reasonable person would have felt compelled to resign by being moved to part-time status, particularly given that the PPUC explicitly told her that she could return to full-time status at any point if she could log 40 hours each week. ECF No. 53-7 at 3–4.

Nor would the job posting on Indeed.com have compelled a reasonable person to resign. Josie believed the job posting to be proof that she would be fired, but all Josie cites is her subjective belief. Her "subjective feelings" alone are inadequate to establish the "intolerability" of her working conditions. *See Garrison*, 2024 WL 4239253, at *6. The remainder of the record evidence, in fact, cuts against Josie's argument, as both

Cunningham and Butcher testified that the PPUC had no plans to fire Josie, ECF No. 57-1 at 258:24–259:2; ECF No. 53-31 at 143:5–7, and that they only posted the job as a precautionary measure in case Josie did not return to full-time work, given that Josie had missed the previous week of work and had informed the PPUC that she would let them know when she would "be able to return to work." ECF No. 64-12 at 6. Considering these circumstances, there is no genuine factual dispute that a reasonable person in Josie's "position would not have felt compelled to resign as a result of the [PPUC] posting her position as available." *Clauson v. Stride Acad.*, 634 F. Supp. 3d 608, 616 (D. Minn. 2022) (citation omitted) (considering similar facts and granting summary judgment to the employer); *see also Wright v. Ill. Dep't of Child. & Fam. Servs.*, 798 F.3d 513, 527–28 (7th Cir. 2015) (explaining that an employee "reasonably believed that she would be fired is not the same as a finding that a reasonable employee . . . would believe, based on the [employer's] actions, that she imminently and inevitably would be terminated").

In sum, Josie's retaliation claims survive to the extent they allege that Josie suffered adverse employment action in the form of being demoted to part-time status. But the Court grants summary judgment to Defendants as to Josie's retaliation claims based on the allegedly adverse employment actions of being placed on a PIP and being constructively discharged.

## CONCLUSION

For these reasons and based on all the files, records, and proceedings herein, **IT IS ORDERED THAT**:

1. Ashley Josie's Motion for Partial Summary Judgment (ECF No. 51) on Count 1 is **DENIED**;

2. City of Princeton and Princeton Public Utilities Commission's Motion for Summary Judgment (ECF No. 55) is **GRANTED in part and DENIED in part** as follows:

   a. Defendants' motion on Count 1 is **DENIED**;

   b. Counts 2, 7, 8, and 9 are **DISMISSED WITH PREJUDICE** except for the allegation that Ashley Josie suffered adverse employment action in the form of being demoted to part-time status; and

   c. Counts 3, 4, 5, and 6 are **DISMISSED WITH PREJUDICE**.

Dated: September 24, 2026

*s/ Laura M. Provinzino*
Laura M. Provinzino
United States District Judge